UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

JOHN DOE,

    Plaintiff,

  v.

THE CHRIST HOSPITAL,

    Defendant.

Case No. 1:23-cv-27
JUDGE DOUGLAS R. COLE

JANE DOE,

    Plaintiff,

  v.

THE CHRIST HOSPITAL,

    Defendant.

Case No. 1:23-cv-31
JUDGE DOUGLAS R. COLE

JOHN DOE,

    Plaintiff,

  v.

THE CHRIST HOSPITAL,

    Defendant.

Case No. 1:23-cv-87
JUDGE DOUGLAS R. COLE

## OPINION AND ORDER

At the federal government's encouragement, The Christ Hospital (the "Hospital") allows its patients to search for medical professionals and to access their medical information on the Hospital's website. Some patients now believe that the Hospital permitted a third party to collect patients' confidential health information while accessing the website. Three patients sued in three separate putative class actions—each in Ohio state court and each asserting state-law theories of relief. The Hospital removed all three cases to federal court. In Case Numbers 1:23-cv-27 and 1:23-cv-31, the Hospital argued that the Court had jurisdiction under the Class Action Fairness Act and the federal officer removal statute. In Case Number 1:23-cv-87, the Hospital removed under only the federal officer removal statute. The plaintiff in each case then moved to remand, citing identical grounds. Those Motions for Remand are now before the Court.

For the reasons discussed below, the Court **GRANTS** the John and Jane Does' Motions for Remand and **REMANDS** Case Numbers 1:23-cv-27, 1:23-cv-31, and 1:23-cv-87 to the Hamilton County, Ohio, Court of Common Pleas.

## BACKGROUND

This Opinion addresses three motions filed in three cases. That said, each case presents largely the same allegations and general theories of relief. And the Hospital removed each on largely the same bases. Given the overlap, the parties consented to consolidated discovery and briefing. For expediency's sake, the Court will generally reference the allegations, arguments, and documents found in Case Number 1:23-cv-

27. The Court will specifically note when it cites documents from Case Numbers 1:23-cv-31 and 1:23-cv-87.

The Hospital operates medical facilities in the Cincinnati, Ohio, area. (Compl., Doc. 2, #159). It maintains a website that enables patients to search for medical care and access their confidential medical information on an internet-based platform called MyChart. (*Id.* at #158). Plaintiffs, who are themselves Hospital patients, allege that the Hospital allows a tracking service, Facebook Pixel, to record their confidential information while patients access the website. (*Id.* at #158–59). According to Plaintiffs, Facebook Pixel transfers that confidential information to a third party, Meta Platforms, Inc. (*Id.*). Plaintiffs say this tracking and transmission occurred without their knowledge or consent and in violation of the Hospital's express and implied representations. (*Id.* at #161, 177).

Plaintiffs sued the Hospital in Ohio state court, asserting state-law claims based mostly on invasion of privacy and breach of contract.[1] (*Id.* at #186–95). Each Plaintiff asserted their claims on behalf of those similarly situated. (*Id.* at #157). In both Case Numbers 1:23-cv-27 and 1:23-cv-31, the patient-plaintiffs provided the following class definition:

> All patients of The Christ Hospital who visited a website belonging to Christ Hospital (or one of its agents), and as a result, had their protected health information (as defined by R.C. 3798.01) transmitted to third parties without authorization during the relevant time period.

---

[1] The three Complaints assert slightly different theories of relief. That said, no Plaintiff asserted a claim under federal law.

3

(*Id.* at #183). In Case Number 1:23-cv-87, the patient-plaintiff provided a slightly different class definition, limiting the class to Ohio residents:

> During the fullest period allowed by law, all current Ohio citizens who are, or were, patients of The Christ Hospital or any of its affiliates and who exchanged communications at Defendant's websites, including www.thechristhospital.com and any other Christ Hospital affiliated website.

(Case No. 1:23-cv-87, Compl., Doc. 2, #164–65).

The Hospital removed each case to federal court. For Case Numbers 1:23-cv-27 and 1:23-cv-31, it argued the Court had subject-matter jurisdiction under the Class Action Fairness Act (28 U.S.C. § 1332) and the federal officer removal statute (28 U.S.C. § 1442(a)(1)). (Doc. 1, #1). As for Case Number 1:23-cv-87, the Hospital only removed under the federal officer removal statute. (Case No. 1:23-cv-87, Doc. 1, #1).

Plaintiffs in each case moved to remand and for leave to conduct jurisdictional discovery. (Docs. 9, 10). The Court issued a stipulated order granting consolidated jurisdictional discovery and setting a briefing timeline for the parties to argue the Motions for Remand. (Doc. 14). Plaintiffs and the Hospital conducted joint discovery. The parties then filed consolidated briefing on the Motions for Remand. (Docs. 16, 17, 18, 19, 20). The matters are now ripe.

## LEGAL STANDARD

When a defendant removes an action from state court to federal court, the federal court has subject-matter jurisdiction only if it would have had original jurisdiction over the action. 28 U.S.C. § 1441(a). The Hospital claims this matter falls within the Court's original jurisdiction in two ways. First, two cases argue that the

4

Court has jurisdiction under the Class Action Fairness Act (CAFA). 28 U.S.C. § 1332(d). For that to be so, four elements must be met: (1) the plaintiff seeks relief on behalf of a class that encompasses at least 100 members; (2) the amount in controversy exceeds $5,000,000, exclusive of interest and costs; (3) minimal diversity exists between the parties; and (4) the action does not fall within one of the enumerated exceptions. *Id.*; *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 592 (2013). But, unlike other removal provisions, "no antiremoval presumption attends cases invoking CAFA, which Congress enacted to facilitate adjudication of certain class actions in federal court." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 89 (2014). Thus, courts resolve doubts about jurisdiction under CAFA in favor of finding it exists. *Brown v. Paducah & Louisville Ry. Inc.*, No. 3:12-cv-818, 2013 WL 5273773, at *2 (W.D. Ky. Sept. 17, 2013).

Apart from CAFA, the Hospital separately argues that the Court has federal officer jurisdiction under 28 U.S.C. § 1442(a)(1). The statute allows removal in cases against "[t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office." *Id.* When a private defendant seeks removal under this provision, three showings are required: "(1) the defendants must establish that they acted under a federal officer, (2) those actions must have been performed under color of federal office, and (3) the defendants must raise a colorable federal defense." *Mays v. City of Flint*, 871 F.3d 437, 442–43 (6th Cir. 2017).

5

**LAW AND ANALYSIS**

As noted, the Hospital asserts two bases for federal jurisdiction: the Class Action Fairness Act and the federal officer removal statute. (Doc. 1, #1). Plaintiffs claim neither works. First, they say the cases fall within CAFA's Home State exception, meaning this Court should decline jurisdiction. Second, Plaintiffs claim that the Court lacks federal officer jurisdiction over the Hospital. Plaintiffs have the better of both arguments, and the Court finds remand is proper in all three cases.

**A.  For Case Numbers 1:23-cv-27 And 1:23-cv-31, The Court Declines CAFA Jurisdiction Under The Home State Exception.**

All seemingly agree Case Numbers 1:23-cv-27 and 1:23-cv-31 meet the requirements of § 1332(d)(2), and (5). The putative classes include over 100 members, the patients seek relief of more than $5,000,000, and minimal diversity exists. *Id.* But the parties dispute whether these controversies fall within CAFA's Home State exception. (Doc. 17, #473; Doc. 19, #591).

Two general exceptions exist to CAFA jurisdiction: Home State and Local Controversy. 28 U.S.C. § 1332(d)(4). These exceptions "are designed to draw a delicate balance between making a federal forum available to genuinely national litigation and allowing the state courts to retain cases when the controversy is strongly linked to that state." *Hart v. FedEx Ground Package Sys. Inc.*, 457 F.3d 675, 682 (7th Cir. 2006). If the elements of either exception are met, the court "shall decline to exercise jurisdiction." 28 U.S.C. § 1332(d)(4). But, as the parties seeking remand, Plaintiffs "bear[] the burden of establishing each element of the exception by a

6

preponderance of the evidence." *Mason v. Lockwood, Andrews & Newman, P.C.*, 842 F.3d 383, 388 (6th Cir. 2016).

Here, Plaintiffs believe that the Home State exception supports remand. Under that exception, a court must decline jurisdiction where two-thirds or more of all members in the putative class and the primary defendants are citizens of the state where the plaintiff filed the action. 28 U.S.C. § 1332(d)(4)(B). Starting with the defendant side of the ledger, all agree the Hospital—the only defendant—is an Ohio citizen. (Doc. 17, #475–76). So the only question remaining is whether Plaintiffs have shown, by a preponderance of the evidence, that two-thirds of the putative class members are Ohio citizens.

State citizenship equals domicile. *Von Dunser v. Aronoff*, 915 F.2d 1071, 1072 (6th Cir. 1990). Thus, while the home state exception speaks of "citizenship," the party invoking the exception must effectively establish the putative class member's domicile. *Mason*, 842 F.3d at 389. A class member is domiciled where they reside and intend to remain. *Id.* at 390. But the party asserting the exception (i.e., the named plaintiff) need not prove every putative class member's intent. Rather, those invoking the exception receive a rebuttable presumption that each class member intends to remain where they currently reside. *Id.* at 390. That said, even if the plaintiff shows that two-thirds or more currently reside in the state in which the action was filed, the defendant still has the opportunity to rebut that presumption with evidence that the class members do not intend to remain. *Id.* at 395. For example, the defendant can

7

show that the class contains a "large number of college students, military personnel, owners of second homes, or other temporary residents." *Id.*

Further, the necessary showing of each putative class member's current residence is flexible. The Sixth Circuit describes the domicile inquiry as not "exceptionally difficult" but "practical and reasonable." *Mason*, 842 F.3d at 392 (citation omitted); *see also Williams v. Homeland Ins. Co.*, 657 F.3d 287, 291 (5th Cir. 2011) (allowing courts to make a "reasonable assumption" of class citizenship). In other words, "[e]xact counts of class members are not required for the Court to evaluate" the exception's applicability. *Middendorf v. W. Chester Hosp., LLC*, 233 F. Supp. 3d 615, 620–21 (S.D. Ohio 2017).

The Plaintiffs in the two cases seeking remand under this exception define their putative classes as:

> All patients of The Christ Hospital who visited a website belonging to Christ Hospital (or one of its agents), and as a result, had their protected health information (as defined by R.C. 3798.01) transmitted to third parties without authorization during the relevant time period.

(Doc. 17, #473). Breaking that down, the class consists of all persons for whom each of the following three elements is true: the person (1) was a patient of the Hospital during the specified time period; (2) visited a Hospital website during that same time period; and (3) had their health information transmitted to a third party as a result. For purposes of the jurisdictional inquiry, the parties focus only on the first two elements.

In their attempt to show that they clear the two-thirds threshold, Plaintiffs present two data sets. First, of all Hospital patients during the relevant period,

8

Hospital records show that 80.3% have Ohio addresses. (Doc. 16-7, #449 (noting that 633,574 of 788,787 patients have Ohio addresses)). Second, of all Hospital patients who both accessed a Hospital website *and* signed up for a MyChart account during the relevant period, Hospital records show that 80.3% (again) have Ohio addresses. (*Id.* at #450 (noting 478,370 of 596,037 MyChart enrollees have Ohio addresses)).

To put that in perspective, the first data set appears overinclusive (some of the 788,787 Hospital patients never visited a website), and the second data set appears underinclusive (some of 788,787 Hospital patients visited a Hospital website and thus are part of the class, but are not among the 596,037 patients who signed up for MyChart). That is, the actual size of the putative class falls somewhere between 596,037 and 788,787. Nonetheless, after staking out the upper and lower boundaries and finding that the pool at each end includes 80.3% Ohio residents, Plaintiffs extrapolate to argue that over two-thirds of the class resides in Ohio.

The Hospital responds with a third data set. (Doc. 19, #594). That data set shows that, when considering *all* website visitors (both patient and non-patient), 60.34% of all visits (less than two-thirds) originated from devices within Ohio. (Doc. 18-1, #495) (noting that 4,032,887 of 6,412,455 website visits can be traced to IP addresses located in Ohio)). And the Hospital believes this population best reflects the potential class composition. (Doc. 19, #594–95).

On balance, the Court finds Plaintiffs have met their burden by a preponderance of the evidence. To start, Plaintiffs provide more reliable data. Both patient data sets tie back to physical Ohio addresses—meaning the patients in

9

question likely *in fact* reside where the data denotes. Moreover, both data sets contain Ohio citizens well over the two-thirds threshold. Under the flexible state citizenship standard, then, the Court can reasonably infer that over two-thirds of Hospital patients who visited a Hospital website reside in Ohio. Finally, the Hospital has provided no rebuttal evidence indicating those residents do not plan to remain within Ohio.

As noted, the Hospital responds that only around 60%, less than two-thirds, of all website visits originated from devices in Ohio. To the Hospital, that data point alone creates sufficient doubt to defeat the patients' Motions. But for two reasons, the Court disagrees.

First, the Hospital's data does not show where the visitors reside but where their devices were located when visiting the website. True, device location can be a proxy for residence. But not always. For example, a trucker could reside in Ohio and check the Hospital's website while hauling through Kentucky. So in predicting residence, the Hospital's location data is already suspect.

Add to that the fact that the Hospital's visit data is dramatically overinclusive of the actual class. All agree that the Hospital had 788,787 total patients during the relevant period. As noted above, this number represents the upper conceivable limit for the class. And it is likely overinclusive, as some patients probably never visited the website. Yet the Hospital's visit data appears *far more* overinclusive. It contains 6,412,455 website visits—over eight times the class's upper conceivable limit. Moreover, it likely includes vast non-class populations, such as prospective patients,

10

patient family members, Hospital staff, health insurance providers, and competitor healthcare providers. Many of these subgroup members—such as patient family members, insurance providers, and competitors—may have a different geographic makeup from the patients themselves. In short, the Court finds the Hospital's data less reliable both because it tracks only device locations and because it is dramatically overinclusive and includes populations who may not be a good proxy for class member citizenship. Finally, it is not lost on the Court that even the Hospital's most favorable data reading still leaves the class awfully close to the necessary two-thirds threshold.

For its last gasp, the Hospital argues that any doubts in class citizenship must be resolved in favor of federal jurisdiction. (Doc. 19, #595). That is generally true. For example, courts in this circuit have rejected the Home State exception in favor of federal jurisdiction when the plaintiffs' data omitted categories of potential class members. *See, e.g.*, *Evans v. AMISUB (SFH), Inc.*, No. 17-cv-2528, 2017 WL 9807437 (W.D. Tenn. Dec. 8, 2017). In *Evans*, for example, the plaintiffs' citizenship analysis and arguments ignored three potential groups of class members. *Id.* at *3. Faced with these omissions, the court resolved the doubts against the plaintiffs, holding their "failure to address these groups, even though a 'practical and reasonable' citizenship inquiry, leaves the citizenship of Plaintiffs' proposed class highly uncertain." *Id.*

But the Court faces a different set of circumstances here. From Plaintiffs' data, the Court knows both the class's conceivable upper and lower limits. And more importantly, the Court knows that, at either endpoint, over 80% of the population are Ohio residents. Finally, Plaintiffs have omitted no category of class members from

11

their analysis. On these facts, the Court draws a "practical and reasonable" inference that the class contains at least two-thirds Ohio citizens.

## B. The Court Lacks Federal Officer Jurisdiction Over The Hospital In All Three Cases.

The Hospital next argues that this Court has federal officer jurisdiction because the Hospital performed the actions at issue while assisting the federal government. To understand this argument and why the Court ultimately disagrees with it, the Court begins with a quick detour to explain the Meaningful Use program, now called the Promoting Interoperability Program.

In 2004, President George W. Bush established the office of National Health Information Technology Coordinator by Executive Order. Exec. Order 13,335 (Apr. 27, 2004). In his Order, the President required the National Coordinator to "develop, maintain, and direct the implementation of a strategic plan to guide the nationwide implementation of interoperable health information technology in both the public and private health care sectors." *Id.*

Then, in 2009, Congress codified the National Coordinator's office in enacting the Health Information Technology for Economic and Clinical Health Act of 2009. 123 Stat. 115, 247 (2009). That Act also provided that the Secretary of Health and Human Services (HHS) "shall … invest in the infrastructure necessary to allow for and promote the electronic exchange and use of health information for each individual in the United States." 42 U.S.C. § 300jj-31(a). This investment remained "consistent with the goals outlined in the strategic plan developed by the National Coordinator." *Id.* The investments the Act required were to be made "through the different agencies

12

with expertise in such goals," including the Centers for Medicare and Medicaid Services (CMS). *Id.* As part of that, HHS and CMS made incentive payments available to certain healthcare providers for adopting health information technology. 42 U.S.C. § 1395w-4(o).

Relevant here, the federal government established the Meaningful Use program. Under this program, CMS incentivized private healthcare providers who expanded patients' abilities to access their health records electronically—i.e., those providers who demonstrated a "meaningful use" of Electronic Health Records. 42 U.S.C. §§ 1395w-4(o), 1395ww(n); 42 C.F.R. § 495.2. The National Coordinator issued guidance recommending that patient information portals be "engaging and user friendly" to increase usage. (Doc. 19, #599). Before receiving the payments, healthcare providers submitted documentation reporting the provider's compliance with the program. *See* 42 U.S.C. §§ 1395w-4(o)(2), 1395ww(n)(3). The federal government eventually rebranded the Meaningful Use program as the Promoting Interoperability Program. (The Court hereafter refers to both together as "the Program.") Under both iterations, though, the Program was and is voluntary, and healthcare providers are not penalized for refusing to participate.

The Hospital has long participated in the Program. Specifically, it established the MyChart patient portal on its website to allow patients to access their medical records. (Doc. 19, #599). And through its engagement with the Program, the Hospital has received incentive payments. (*Id.* at #600). The Hospital also argues that Facebook Pixel's data collection tools provide customer usage insights and help the

13

Hospital understand how to make the site more customer friendly. (*Id.* at #605). To that end, the Hospital claims that tracking customers' website usage assists the federal government in carrying out the Program.

With that background in mind, return to the federal officer removal statute. As noted above, a court has federal officer jurisdiction over a private defendant when the defendant (1) acted under a federal officer, (2) performed the actions at issue under color of federal office, and (3) raises a colorable federal defense. *Mays*, 871 F.3d 442–43. "'[T]he removal statute's basic purpose is to protect the Federal Government from the interference with its operations' that would occur if a federal officer could be tried in state court for a state offense related to the operation." *Id.* at 443 (quoting *Watson v. Philip Morris Cos.*, 551 U.S. 142, 150 (2007)). And to fulfill that purpose, courts read the statute broadly and liberally construe its application. *Watson*, 551 U.S. at 147.

The Court begins and ends with the first element—acting under a federal officer. For this element, the private party must prove some "relationship that involves 'acting in a certain capacity, considered in relation to one holding a superior position or office.'" *Id.* at 151 (citation omitted). Courts generally look for a contract, delegation of legal authority, employer/employee relationship, or some other indicia of a principal/agent relationship between the federal officer and the private actor. *See Mays*, 871 F.3d at 444–45. The relationship "typically involves 'subjection, guidance, or control.'" *Watson*, 551 U.S. at 151 (citation omitted).

In addition, the private party "must be assisting the federal government in carrying out the government's *own* tasks in order to invoke federal-officer removal." *Mays*, 871 F.3d at 444 (emphasis added). To determine whether that is so in a given case, courts may consider whether the private party performs a role the government would otherwise need to perform but for the private party's assistance. *See Ohio State Chiropractic Ass'n v. Humana Health Plan Inc.*, 647 F. App'x 619, 623 (6th Cir. 2016).

A government contractor can satisfy the acting-under element where the contractor is bound to perform governmental tasks under close federal oversight. For example, the Sixth Circuit held that a contractor who removed mold from federally owned air-traffic-control towers, and did so under the close direction of Federal Aviation Administration employees, could remove under the statute. *Bennett v. MIS Corp.*, 607 F.3d 1076, 1087–88 (6th Cir. 2010). The circuit summarized that "the contractual relationship between the contractor and the FAA was an unusually close one, involving detailed regulation, monitoring, and supervision" that "satisfied § 1442(a)(1)'s acting under requirement." *Id.* at 1088 (quoting *Watson*, 551 U.S. at 148, 153) (cleaned up).

On the other hand, a private party does not "act under" a federal officer where the officer merely regulates them. *Watson*, 551 U.S. at 156. Nor is receiving federal funding dispositive. *Mays*, 871 F.3d at 444. That is, even where a private party receives money from the federal government to perform a task, that alone will not evidence the necessary principal/agent relationship. *Id.* Finally, courts typically do not view a government contractor as "acting under" a federal officer where the

contractor enjoys broad discretion and exercises independent judgment. *See In re Nat'l Prescription Opiate Litig.*, 327 F. Supp. 3d 1064, 1072–75 (N.D. Ohio 2018) (collecting cases). Such circumstances lack the necessary indicia of federal "subjection, guidance, or control." *Watson*, 551 U.S. at 151.

Under this framework, the Hospital says it acted under federal officers by participating in the Program. (Doc. 19, #601). The Hospital notes that the HHS Secretary has a statutory mandate to "invest in the infrastructure necessary to allow for and promote the electronic exchange and use of health information." (*Id.* (quoting 42 U.S.C. § 300jj-31(a)). And, the Hospital says, the federal government could not achieve that mandate without help from healthcare providers, like the Hospital, through their participation in the Program. (*Id.*). Accordingly, the Hospital argues that it "assists" with government "tasks." (*Id.* at #600–01). Finally, the Hospital highlights that, much like a contractor, the federal government pays the Hospital for its participation. (*Id.* at #601).

Nonetheless, the Hospital has failed to show that it acts under a federal officer. To start, the Hospital has identified no federal contract nor express delegation of federal authority. Rather, the Hospital voluntarily participates in a program and receives incentive payments. That arrangement is far from the "subjection, guidance, or control" expected in a principal/agent relationship. *Watson*, 551 U.S. at 151.

Nor does the Hospital assist with or perform a government task or duty through participation in the Program. *See Mays*, 871 F.3d at 444. No evidence shows that HHS or CMS would establish an online health interface if the Hospital and other

16

healthcare providers chose not to participate. Rather, the Program is principally designed to encourage the *private* sector to establish *private* health interfaces. True, the Hospital acted in the public interest when doing so. But acting in the public interest isn't the same as acting under a federal officer. *See Ohio State Chiropractic Ass'n*, 647 F. App'x at 623–24 (noting a private actor can help the government serve the public without performing a government task).

Finally, as noted, without more evidence of a principal/agent relationship, the Hospital's receipt of incentives payments changes nothing. *Mays*, 871 F.3d at 444 ("[T]he receipt of federal funding alone cannot establish a delegation of legal authority."); *Quinto v. Regents of Univ. of Cal.*, No. 22-cv-04429, 2023 WL 1448050, at *2 (N.D. Cal. Feb. 1, 2023) ("[R]eceiving incentive payments for acting in a way that promotes a broad federal interest … is not the same as being contracted to carry out, or assist with, a basic governmental duty.").

The Hospital responds that other courts have analyzed the Program and concluded that participating private parties "act under" federal officers. (Doc. 19, #601). In particular, it points to *Doe v. UPMC*, No. 2:20-cv-359, 2020 WL 4381675 (W.D. Pa. July 31, 2020), and *Doe v. ProMedica Health Sys.*, No. 3:20 CV 1581, 2020 WL 7705627 (N.D. Ohio Oct. 30, 2020). The Hospital asks the Court to follow those cases' lead and hold that the Hospital's participation in the Program entitles it to federal jurisdiction.

To the Hospital's credit, these cases do support its position. *UPMC*'s discussion is perhaps the more fulsome. There, the court framed the inquiry as "whether the

private entity's complained-of conduct involves an effort to assist, or to help carry out, the duties or tasks of the federal superior." 2020 WL 4381675, at *3 (cleaned up). And the court described the private defendant's burden as "not so high" to establish the needed "agency relationship with the federal government." *Id.* at *5. Applying that framework, the *UPMC* court found that the defendant's receipt of incentive payments "shows the relationship … is less like [a] regulator-regulated relationship … and more like [a] government contractor relationship." *Id.* at *6. The court apparently found that analogy dispositive, concluding that the defendant therefore acted under the federal officer. *Id.* Then, relying heavily on *UPMC*, the *ProMedica* court reached the same result. *See Doe v. ProMedica Health Sys., Inc.*, No. 3:20-cv-1581, 2020 WL 7705627, at *2–3 (N.D. Ohio Oct. 30, 2020). The *ProMedica* court summarized that, "[b]ecause Defendant's participation assisted the federal government in achieving [a federal] goal, Defendant has satisfied the 'acting under' prong." *Id.* at *3.

But the Court finds *UPMC* and *ProMedica* unpersuasive. In particular, they take an overly broad view of what counts as assisting with a federal task. In this Court's view, it takes more than merely acting in the public's interest or supporting a general federal policy to qualify. Instead, the private party must typically assist with a task the federal officer would otherwise have to perform themselves, but for the private party. *See, e.g.*, *Ohio State Chiropractic Ass'n*, 647 F. App'x at 623. As discussed above, there is no evidence of that here. And again, the Sixth Circuit has already said the receipt of federal funding does not necessarily evince the principal/agent relationship needed for removal. *See Mays*, 871 F.3d at 444. Against

18

that backdrop, *UPMC* and *ProMedica*'s focus on federal funding does little to move the needle.

That's not all. As Plaintiffs point out, other district courts have explicitly rejected *UPMC* and *ProMedica*, finding participation in the Program does not mean a private party acts under a federal officer. (Doc. 17, #468–69 (collecting cases)); *see, e.g.*, *Mohr v. Trustees of Univ. of Pa.*, No. 23-cv-731, 2023 WL 3044594, at *5 (E.D. Pa. Apr. 20, 2023); *Quinto*, 2023 WL 1448050, at *2. Those courts concluded that *UPMC* and *ProMedica* "entailed an overly broad interpretation of what it means to assist a federal superior with its tasks or duties, which 'would permit removal to federal court in circumstances far beyond anything Congress intended.'" *Quinto*, 2023 WL 1448050, at *3 (quoting *Jalili-Farshchi v. Aldersly*, No. 3:21-cv-4727, 2021 WL 6133168, at *4 (N.D. Cal. Dec. 29, 2021)). This Court agrees.

Accordingly, the Hospital's participation in the Program does not suffice to show that it acted under a federal officer. Thus, the Hospital cannot avail itself of federal officer jurisdiction, and the Court need not discuss the other two prongs.

## CONCLUSION

For these reasons, the Court declines to exercise jurisdiction over these matters. The Court thus **GRANTS** the John and Jane Doe Motions for Remand (Doc. 9 in Case No. 1:23-cv-27; Doc. 7 in Case No. 1:23-cv-31; and Doc. 13 in Case No. 1:23-cv-87) and **REMANDS** these actions to the Court of Common Pleas for Hamilton

County, Ohio. The Court **INSTRUCTS** the Clerk to **TERMINATE** these matters on the Court's docket.

    **SO ORDERED.**

July 26, 2023
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**